**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| **Ethan D. Dean Individually and** ) | |
| **as a Representative of a Class of** ) | |
| **Participants and Beneficiaries on Behalf** ) | |
| **of the Huntington Ingalls Industries** ) | |
| **Savings Plan** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No._____** |
| ) | |
| **Huntington Ingalls Industries, Inc.** ) | |
| **and HII Administrative Committee** ) | |
| ) | |
| **Defendant.** ) | |

**CLASS ACTION COMPLAINT**

1.      Plaintiff, Ethan D. Dean, individually and as a representative of a class of participants and beneficiaries of the Huntington Ingalls Industries Savings Plan, (hereinafter, the "Plan") brings this Employee Retirement Income Security Act of 1974 ("ERISA")[1] action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) and Rule 23 of the Federal Rules of Civil Procedure against Defendants, Huntington Ingalls Industries, Inc., (hereinafter, "Huntington" or "Company") and HII Administrative Committee (hereinafter "HII" and together with Huntington, "Defendants") for: (1) failure to comply with Plan terms; (2) breach of ERISA's fiduciary duties; (3) violation of ERISA's prohibited transaction rules; and (4) violation of ERISA's anti-inurement provision.

---

[1] 29 U.S.C. §§1001–1461.

2. ERISA requires a fiduciary to act "solely in the interest of participants . . . for the exclusive purpose of providing benefits to participants and beneficiaries; and defraying reasonable expenses of administrating the plan" to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest." 29 U.S.C. §§ 1104(a)(1)(A)-(B); 1106(b)(1).

3. This District has recognized these duties as the "highest known to the law." *DiFelice v. US Airways, Inc.*, 235 F.R.D. 70, 76 (E.D. Va. 2006). These duties require fiduciaries to have "an eye single to the interests of the participants and beneficiaries," *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir. 1982), and "to deal fairly and honestly with beneficiaries," *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1025 (2025) ("*Cunningham*"). The Fourth Circuit also instructs ERISA fiduciaries that "a fiduciary must act *as if* it is free of any conflict." *Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 181 (4th Cir. 2023). Further, "'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to plan participants." *Bedrick by & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

4. The Supreme Court and Fourth Circuit warn ERISA fiduciaries that they are not immunized from their duties to exclusively act in the best interest of plan participants when they purport to adhering to a plan document or because the conduct at issue is not prohibited by ERISA. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA); *Chao v. Malkani*, 452 F.3d 290, 293 (4th Cir. 2006) (internal citations omitted) ("The duty of loyalty requires that a fiduciary discharge his duties with respect to a plan

2

solely in the interest of the participants and beneficiaries, and thus plan assets generally cannot inure to the benefit of any employer.").

5.      ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham*, 145 S. Ct. at 1025.

6.      ERISA also mandates that fiduciaries must discharge their fiduciary duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. 1104(a)(1)(D). The Supreme Court has clearly stated that there is "no exemption from this duty. . ." *Kennedy v. Plan Administrator for DuPoint Savings and Investment Plan*, 555 U.S. 285, 300, 129 S. Ct. 865 (2009).

7.      As detailed below, instead of following the terms of the Plan and loyally and prudently acting in the best interest of Plan participants and avoiding prohibited transactions, Defendants chose to use Plan assets to overwhelmingly benefit Huntington, to the detriment of the Plan and its participants, by using over $15.3 million of Plan assets to offset Huntington's contractual obligations to make declared matching contributions to the Plan, while not using any forfeitures to offset Plan expenses and requiring Plan Participants to pay over $28.2 million in Plan expenses to the Plan's third-party service providers, both directly and indirectly, that should never have come out of (or reduced the value of) their accounts. Even more egregious, during the class period Defendants had millions of dollars of leftover Plan assets available at the end of each year that could have covered substantial portions or all of Plan participants' expenses even after they enriched Huntington with over $15 million in Plan assets.

8.      To remedy these fiduciary breaches and ERISA violations, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, brings this action on

behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.      This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

10.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

11.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

## PARTIES

12.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) that covers eligible employees of Huntington and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

13.     Plaintiff Ethan D. Dean is a citizen of the State of Mississippi, was previously employed by Huntington during the class period, and was a participant in the Plan during the class period. As such, he is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

4

14.    During the class period, Plaintiff's individual account was charged, and Plaintiff paid expenses attributable to the maintenance and administration of the Plan to the Plan's third-party service providers.

15.    Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries through the misallocation of Plan assets by Defendants with regard to the Plan as it relates to his individual 401(k) account. This injury is fairly traceable to Defendants' unlawful conduct in using Plan assets for their own benefit and this harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and to the class.

16.    Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries.

17.    The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan assets in the form of forfeitures) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

18.    Having never managed a very large 401(k) Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated by the Defendants and also lacked actual knowledge of how Plan forfeitures were used by the Defendants.

19.    Huntington is the largest military shipbuilding company in the United States and is headquartered at 4101 Washington Ave., Building 909-6, Newport News, VA 23607.

20.    Huntington is the Plan sponsor under 29 U.S.C. § 1002(16)(B).

21.    HII is the Plan Administrator pursuant to 29 U.S.C. § 1002(16)(A) with broad authority over the administration and management of the Plan and who exercise or exercised

5

discretionary authority or discretionary control respecting the management or disposition of its assets, or have had discretionary authority or discretionary responsibility in the administration of the Plan and are responsible or liable in some manner for the conduct alleged in the complaint.

22.    Huntington, as Plan sponsor, appointed HII as the Plan Administrator and, under ERISA, has a duty to monitor HII.

## FIDUCIARY STANDARD REQUIRED UNDER ERISA AND FIFTH CIRCUIT

23.    Under ERISA, when making the decision regarding the use of Plan assets, Defendants have been and are required by 29 U.S.C. §§ 1104(a)(1)(A) to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; ***and*** (ii) defraying reasonable expenses of administering the plan." (emphasis added); *Cunningham*, 145 S. Ct. at 1025.

24.    Under 29 U.S.C. §§ 1104(a)(1)(B), ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets" *Fifth Third Bancorp*, 573 U.S. at 419, which requires fiduciaries to "act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would. . . .", 29 U.S.C. § 1104(a)(1)(B).

25.    The duties of loyalty and prudence are the "highest known to the law," *DiFelice v. US Airways, Inc.*, 235 F.R.D. 70, 76 (E.D. Va. 2006), and require fiduciaries to "maximize retirement savings for participants", *Fifth Third Bancorp*, 573 U.S. at 420.

26.    Under ERISA, 29 U.S.C. § 1104 (a)(1)(D) also requires plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan . . ."

6

27.    Under ERISA, anyone who exercises discretion or control over plan assets, including Huntington as Plan Sponsor and HII as Plan Administrator, is a fiduciary (hereafter "Plan Fiduciaries" or "Defendants"). 29 U.S.C. § 1002(21)(A).

28.    Fiduciaries are not immunized from their duties to exclusively act in the best interest of plan participants when they purport to adhere to the plan document or because the conduct at issue is not prohibited by ERISA. *Fifth Third Bancorp*, 573 U.S. at 421 (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA); *Chao*, 452 F.3d at 293 (internal citations omitted) ("The duty of loyalty requires that a fiduciary discharge his duties with respect to a plan solely in the interest of  the participants and beneficiaries, and thus plan assets generally cannot inure to the benefit of any employer.").

29.    As an individual account, defined contribution retirement plan, the Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participants' retirement benefit in a defined contribution plan equals (1) the amount of the participants' voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses. *Cunningham*, 145 S. Ct. at 1026 (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses").

## FACTS APPLICABLE TO ALL COUNTS[2]

### A.  The Plan

30.     The Plan was created by Huntington for the sole benefit of its eligible employees.

31.     In accordance with ERISA, the Plan's operating documents provide that "All contributions made by the Employer to the Trust Fund will be used for the exclusive benefit of the Participants and their Beneficiaries and will not be used for nor diverted to any other purpose except the payment of the costs of maintaining and administering the Plan."

32.     That said, Huntington derives many indirect benefits by virtue of sponsoring the Plan. For example, in addition to tax benefits it is well known that retirement plans are critical tools for employers to attract and retain high quality employees. *See* https://www.paychex.com/articles/employee-benefits/employermatching-401k-benefits ("[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover.").

33.     Throughout the class period the Plan paid direct and/or indirect compensation to third-party service providers (listed in the Plan's Form 5500s and the Form 5500 of the Master Trust that held 100% of the Plan's assets) for services to administer the Plan ranging from, among others, recordkeeping and information management, accounting, custodial, trustee, legal, consulting services, investment advisory services and other fees paid directly and indirectly by the Plan. Hereafter the payment for services provided to the Plan (directly or indirectly) shall collectively be referred to as "Plan Expenses".

---

[2] All factual assertions in this section are taken from: (1) documents provided by Defendants to Plaintiff's counsel, including the Plan's operative governing documents during the class period and the Plan's summary plan description; (2) the Plan's Form 5500s filed by Defendants with the Department of Labor and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/; and (3) Plan documents provided by Plaintiff.

34.     The use of Plan assets to pay Plan Expenses from the accounts or the value of the investments[3] of Plan Participants reduces the funds available to Plan Participants for distribution and/or investing and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

35.     The Plan Fiduciaries elected to use nontransparent structures to pay plan expenses by both using asset-based fee structures as well as bundling several different types of Plan Expenses together in their disclosure documents including, but not limited to, their participant Fee Disclosure Documents (required by 29 CFR § 2550.404a-5(C)(2)(ii)(B)), as well as their Form 5500 disclosures, among other things.

36.     For example, in its 2025 "Annual Fee Disclosure Statement" the Plan Fiduciaries disclosed to the Plan participants that "[y]ou won't see these [Asset-based] fees directly because they are charged to your investment options and reduce your investment earnings. These fees are shown in Section 3 of this statement and include plan expenses, such as investment management, trustee, legal, accounting, recordkeeping and participant services."

37.     Section 3 provides that "[s]ome[4] of the plan's Plan Expenses may have been paid by fees from one or more of the plan's investment funds" and later states that the "[t]otal asset-based fees are charged to the investment fund to cover plan expenses, such as investment management, trustee, legal, accounting, recordkeeping and participant services."

---

[3] Some of the Plan Expenses are paid to the Plan's recordkeeper from the investment options in the Plan through the expense ratio of those investment options and are not reflected in the account statements of the Plan Participants.

[4] In their "Annual Fee Disclosure Statement" the Plan Fiduciaries never inform Plan participants which of the investment options are paying the Plan's Plan Expenses.

38.     Accordingly, most Plan Expenses are paid indirectly from the accounts of Plan participants even though there will be no direct transaction visible on the account statements of Plan participants.[5]

39.     Throughout the class period, the Plan has been funded by a combination of elective deferrals by Plan Participants and various types of company contributions, each of which is deposited into the Plan's trust fund and allocated to individual participant accounts.

40.     Relevant to this Complaint, throughout the class period the terms of the Plan provided that "Employers shall make Retirement Account Contributions ("RAC") for certain Active Participants" which "are calculated and credited for each payroll date rather than annually . . . ."

41.     In other words, Company Huntington is contractually required to make RAC to the Plan each time the Company pays Plan participants through its payroll process.

42.     Huntington must pay all RAC that have accrued throughout a calendar year to the Plan trustee within a reasonable period of time after the end of the prior calendar year.

43.     Upon their deposit into the Plan's trust fund, all participant contributions and Huntington RAC become assets of the Plan. In fact, under ERISA, as soon as Company contributions are segregated from Company assets, for purposes of prohibited transactions, Company contributions should also be viewed as Plan assets.[6] *See e.g.,* 29 C.F.R. § 2510.3-102 (noting that plan assets include participant contributions as of the earliest date they can "reasonably be segregated" from the employer's general assets).

---

[5] Plaintiff is continuing to investigate whether the fees paid by the Plan were reasonable and whether the Plan Fiduciaries violated their fee disclosure duties.

[6] For example, a Company's contributions may become segregated from the Company's assets in the possession of the trustee prior to the receipt of the assets by the Plan.

44.    Under the terms of the Plan, participants are immediately vested in their own contributions as well as any actual earnings thereon. In contrast, participants are not 100% vested in RAC made by Company and any actual earnings thereon until three years of vesting service.

45.    To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of Huntington contributions and any actual earnings thereon (hereafter "Forfeited Plan Assets" or "Forfeitures") in his or her account on the earlier of the date the participant takes a distribution of his or her vested interest in the Plan or the date the participant incurs a five-consecutive-year break in vesting service.

46.    During the class period, the Plan document clearly instructed Plan Fiduciaries how to allocate Forfeited Plan Assets in a section titled "Application of Forfeitures". That section begins by telling the Plan Fiduciaries in relevant part that "to the extent not used in the Plan Year to restore Participants' Accounts pursuant to Section 7.05 or to pay expenses in accordance with Section 16.11, the Committee shall apply Forfeitures to reduce Company contributions due for the Plan Year in which they arise."

47.    In other words, under the plain language of the Plan Document, the Plan Fiduciaries were required to use Forfeited Plan Assets *first* to restore Plan participant accounts or pay Plan Expenses *prior to* applying Forfeited Plan Assets to reduce Company contributions. Only after the restoration of Plan participant accounts and the payment of Plan Expenses were the Plan Fiduciaries allowed to reduce Company contributions.

48.    By drafting the Plan with terms that required Forfeited Plan Assets to be used to defray Plan Expenses prior to reducing Company contributions, the terms of the Plan provided a benefit, the defraying of plan expenses, in addition to any promised Company contributions.

11

49.    Alternatively, by drafting the Plan with terms that gave the Plan Fiduciaries discretion with respect to the use of Forfeited Plan Assets, the terms of the Plan provided a benefit, the defraying of plan expenses, in addition to any promised Company contributions, because principles of trust law and ERISA explicitly require fiduciaries to act solely in the interest of Plan participants and for the exclusive purpose of providing benefits to Plan participants and defraying Plan Expenses. A loyal and prudent fiduciary acting under those principles and under the facts and circumstances confronting the Plan Fiduciaries throughout the class period, when given discretion would always choose to defray Plan Expenses prior to reducing Company contributions.

**B.    Plan Fiduciaries' Disloyal and Conflicted Use of Forfeitures During Class Period**

50.    Yet throughout the class period, the Defendants, in violation of the terms of the Plan document and ERISA, consistently did not use the Forfeited Plan Assets to offset Plan Expenses prior to using the Forfeited Plan Assets to reduce Huntington's contractually obligated and declared RAC to the Plan resulting in a reduction in the value of Plaintiff and the Plan's accounts.

51.    Instead, the Plan Fiduciaries have consistently chosen to utilize the vast majority of Forfeited Plan Assets to benefit Huntington by reducing Huntington's contractually obligated declared RAC to the Plan and paying Plan Expenses from Plan assets *other* than Forfeited Plan Assets, *i.e.*, participants' accounts.

52.    From 2019 through 2023, the terms of the Plan obligated Huntington to make RAC to the Plan in the following amounts: (1) in 2019, at least $80,556,499[7]; (2) in 2020, at least

---

[7] Derived from the Plan's 2019-2023 Forms 5500s. For 2019, the figure was derived from Huntington's disclosed contribution amount net of forfeitures of $77,856,499 plus $2,700,000 of Forfeited Plan Assets that were used to reduce Employer Contributions. This methodology was used for each subsequent year.

$90,042,387; (3) in 2021, at least $97,254,712; (4) in 2022, at least $146,345,662; (5) and in 2023, at least $149,889,069.

53.    From 2019 through 2023, the Plan Fiduciaries decided to offset Huntington's obligation to make RAC by allocating Forfeited Plan Assets in the following amounts: (1) in 2019, $2,700,000; (2) in 2020, $2,117,000; (3) in 2021, $2,304,000; (4) in 2022, $3,991,000; and (5) in 2023, $4,199,000. These actions saved Huntington the respective amounts, which flowed directly to its bottom-line profit.

54.    From 2019 through 2023, the Plan Fiduciaries were required under the terms of the Plan and ERISA to direct the use of Forfeited Plan Assets in the following minimum amounts: (1) in 2019, approximately $3,525,000[8]; (2) in 2020, approximately $2,922,000; (3) in 2021, approximately $3,633,000; (4) in 2022, $4,854,000; and (5) in 2023, $4,328,000.

55.    From 2019 through 2023, the Plan Fiduciaries caused Plan Participants to pay Plan Expenses through deductions from their accounts and indirectly through revenue sharing or similar methods as described above. The minimum amounts paid by Plan participants either directly or indirectly are estimated to be as follows: (1) in 2019, $5,201,334; (2) in 2020, $4,488,282; (3) in 2021, $6,649,604; (4) in 2022, $5,952,339; (5) and in 2023, $6,005,543.[9]

---

[8] Derived from the Plan's 2019-2023 Forms 5500s. For 2019, the amount of $3,525,000 represents the $2,700,000 of Forfeited Plan Assets that were used during the year plus the $825,000 in unallocated Forfeited Plan Assets in the plan on December 31, 2019. This methodology was used for each subsequent year.

[9] Plan Expenses are estimated based on the direct compensation reported in Schedule C of Form 5500 for HII DC PLANS MASTER TRUST FUNDS. The Plan Expenses estimated for the Plan represent a proportionate allocation of the total expenses disclosed in the Master Trust based on the Plan's proportional share of total assets of the Master Trust.

56.     Throughout the class period the Plan Fiduciaries paid at least the amounts set forth above to several service providers including, but not necessarily limited to, State Street Global Advisors, Invesco, State Street Bank, Towers Watson Investment Services, State Street Retiree Services, Alight Financial Advisors, Alight Solutions, Deloitte & Touche, McGuire Woods, Blackrock Institutional Trust, Grant Thorton, and Wilmer Hale.

57.     Through the class period the Plan Fiduciaries caused the plan to engage in thousands of transactions to reduce the value of the accounts of Plan participants to pay these service providers most, if not all of whom, are parties in interest to the Plan.

58.     Throughout the class period the terms of the Plan required Plan Fiduciaries to use Forfeited Plan Assets to provide benefits and defray Plan Expenses as soon as administratively practicable. As of December 31, each year from 2019 through 2023, unallocated Forfeited Plan Assets remained unused in the following amounts: (1) in 2019, $825,000; (2) in 2020, $805,000; (3) in 2021, $1,329,000; (4) in 2022, $863,000; and (5) $129,000. At all times during the class period it was administratively feasible to use Forfeited Plan Assets to provide retirement benefits and pay Plan Expenses and avoid carrying these amounts in an unallocated plan account over to the next calendar year.

59.     ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that the deferrals of Plan Participants are promptly invested pursuant to the direction each Plan Participant and are not allowed to sit in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving Plan Participants from the potential for investment earnings. *See, e.g.,* DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); *see also* 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant

14

contributions as of the earliest date they can reasonably be segregated" from the employer's general assets); Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[10] From 2019 through 2023, the Plan Fiduciaries didn't use any forfeitures to offset Plan Expenses out of over $15.4 million in Forfeited Plan Assets available for direction.

60.    A prudent and loyal fiduciary presented with this scenario, would not have applied millions of dollars to offset future company contributions and left millions of dollars unused each year when Plan participants shouldered millions of dollars in Plan Expenses. These actions by the fiduciaries, at a minimum, necessitate the inference that imprudence or disloyalty was at play in their decision-making process.

61.    The Plan's 2024 Form 5500 is not yet available, but, upon information and belief, the amount of unallocated Forfeited Plan Assets for calendar year 2023 (provided above) was substantially similar in calendar year 2024 and that in 2024 the Plan Fiduciaries again exercised discretion over, and control of, Plan assets by failing to use the unallocated Forfeited Plan Assets

---

10 *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

to pay Plan Expenses or to allocate the Forfeited Plan Assets back to eligible participants in accordance with a definite formula defined in the Plan.

62.     The following chart demonstrates the Plan Fiduciaries' disloyal and conflicted use of forfeitures during the class period:

| YEAR | FORFEITURES USED FOR HUNTINGTON | FORFEITURES USED FOR PLAN ADMIN EXPENSES | Est. of EXPENSES CHARGED TO THE PLAN (Direct Compensation) | BALANCE AT YEAR END NOT USED |
|---|---|---|---|---|
| 2019 | $2,700,000 | $0 | $5,201,334 | $825,000 |
| 2020 | $2,117,000 | $0 | $4,488,282 | $805,000 |
| 2021 | $2,304,000 | $0 | $6,649,604 | $1,329,000 |
| 2022 | $3,991,000 | $0 | $5,952,339 | $863,000 |
| 2023 | $4,199,000 | $0 | $6,005,543 | $129,000 |
| **Total** | **$15,311,000** | **$0** | **$28,297,102** | **$3,951,000** |

63.     Upon information and belief, the Plan Fiduciaries have continued to violate ERISA in their use of Forfeited Plan Assets until around April 1, of 2025 when the Plan was amended to specifically require the Plan Fiduciaries to use Forfeited Plan Assets to "reduce Company contributions prior to using Forfeited Plan Assets to pay Plan Expenses.

**C.    Defendants' Plan and ERISA Fiduciary Violations Based on Forfeiture Use**

64.     Under the clear and unambiguous terms of the Plan, Plan Fiduciaries were required to first use Forfeited Plan Assets to pay Plan Expenses prior to reducing Company contributions.

65.     Accordingly, under the terms of the Plan document, the Plan Fiduciaries did not have discretion related to the use of Forfeited Plan Assets.

66.     Under ERISA, when making the decision regarding the use of Forfeited Plan Assets, the Plan Fiduciaries have been and are required by 29 U.S.C. § 1104 (a)(1)(D) to discharge their duties "in accordance with the documents and instruments governing the plan . . . "

67.     As detailed above, the Plan Fiduciaries failed to follow the terms of the Plan when they failed to first use the Forfeited Plan Assets to cover the Plan Expenses prior to reducing Company contributions.

68.     However, even if the plan did not require Fiduciaries to first use the Forfeited Plan Assets to cover Plan Expenses, which it does, ERISA and the Plan document granted discretion to the Plan Fiduciaries with respect to the use and control of Forfeited Plan Assets.

69.     Defendants did not, for example, investigate whether there was any set of circumstances that would support a decision to reduce Company contributions prior to defraying Plan Expenses.

70.     The Plan Fiduciaries improperly, disloyally, and imprudently exercised that discretion to benefit Huntington at the expense of the Plan and Plan Participants by failing to use unallocated Forfeited Plan Assets to pay Plan Expenses or allocate back to Plan Participants and, instead, exercised that discretion to use Forfeited Plan Assets to reduce required RAC.

71.     Throughout the entire class period, the discretion given to the Plan Fiduciaries under the terms of the Plan and ERISA created a conflict of interest with respect to the Plan Fiduciaries' use of Forfeited Plan Assets. In other words, if the Plan Fiduciaries exercised their discretion to choose to allocate over $15.3 million of Forfeited Plan Assets (from 2019 through 2023) towards Huntington's RAC, that decision would positively benefit the bottom-line profits of Huntington by that amount.

17

72.     On the other hand, to the extent the Plan Fiduciaries exercised their discretion granted to them by Huntington under the terms of the Plan to use the Forfeited Plan Assets to reduce both the direct and indirect Plan Expenses incurred by Plan Participants throughout the class period, that conduct would result in the Plan Participants receiving the full value of their defined contribution benefits promised to them under the terms of the Plan and as required by ERISA and Supreme Court precedent (*i.e.*, acting solely in the interest of plan participants *and* for the exclusive purpose of providing retirement benefits and defraying reasonable expenses of administering the Plan). *See* 29 U.S. Code § 1104(a)(1).

73.     If the Plan Fiduciaries had not acted contrary to the Plan or, alternatively, not used their discretion (despite having multiple other options available under the Plan and ERISA) to reduce employer contributions with plan assets, then $15.3 million in additional assets (from 2019 through 2023) would have been contributed to the Plan and would have been invested by the Plan Participants.

74.     Crucially, had the Plan Fiduciaries used their discretion to use the $15.3 million (from 2019 through 2023) in Forfeited Plan Assets to defray Plan Expenses or allocate the $15.3 million in Forfeited Plan Assets back to Plan Participants to defray Plan Expenses, that would not have caused Huntington to pay more than what Huntington promised under the terms of the Plan and its declared contributions. Rather, the Plan Fiduciaries' decision to allow Huntington to offset its RAC with Forfeited Plan Assets caused Huntington to pay $15.3 million less than what Huntington promised to contribute in RAC to the Plan under the terms of the Plan.

75.     Loyal fiduciaries following a prudent process would not choose to offset Huntington's declared RAC instead of reducing the Plan Participants' Plan Expenses or, alternatively failing to allocate the Forfeited Plan Assets back to the accounts of Plan Participants

18

to be used to defray Plan Expenses, which reduced the value of both the Plan as a whole and the accounts of individual Plan Participants.

76. Defendants' conduct, at the very least, necessitates the inference that they either did not have processes in place to weigh the benefits to participants in allocating forfeitures, or that they ignored their duty to act exclusively for the Plan participants because the Plan Fiduciaries were motivated by self-interest and/or the interest of Huntington when allocating Forfeited Plan Assets.

77. To the extent that Defendants exercised their discretion, they exercised it almost solely for the exclusive purpose of reducing Huntington's declared RAC to the Plan, thereby saving Huntington millions of dollars at the expense of the Plan and Plan Participants and not for the purpose of "maximiz[ing] retirement savings for participants", as the Supreme Court requires of ERISA fiduciaries. *Fifth Third Bancorp*, 573 U.S. at 420.

78. Consequently, throughout the class period, an objective analysis of the available options throughout the class period, guided solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants ***and*** defraying reasonable expenses of administering the Plan would indisputably not result in Plan Fiduciaries choosing to use the vast majority of Forfeited Plan Assets available to reduce future Employer Contributions throughout the class period instead of using Forfeited Plan Assets to defray Plan Expenses.

79. Additionally, under the minimum standard of care under the circumstances then prevailing, a prudent plan fiduciary having the discretion to select among several options related to the allocation of Forfeited Plan Assets, acting solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and defraying

reasonable expenses of administering the plan, would choose options that would ensure that Forfeited Plan Assets were to allocated during the same year in which they arose.

80.    In other words, here the facts suggest that throughout the class period, the Plan Fiduciaries improperly, disloyally, and imprudently exercised discretion when deciding to use Forfeited Plan Assets to overwhelmingly reduce RAC when other options were available.

81.    As described in detail above, throughout the class period, the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce RAC was, all else being equal, in the best interest of Huntington because that option decreased Huntington's own declared contribution costs.

82.    Similarly, as described in detail above, throughout the class period, the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce RAC over paying Plan Expenses or allocating the Forfeited Plan Assets to the accounts of eligible Plan Participants reduced the value of Plan assets and the accounts of Plan Participants and the benefits available to Plan Participants.

83.    Further, as described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan Assets when directing the use of Participants' accounts to pay Plan Expenses to third-party service providers.

84.    Throughout the class period the Plan Fiduciaries caused the Plan to engage in thousands of transactions that used plan assets to constitute a furnishing of services between the plan and a party in interest.  At the same time, through these thousands of transactions paying Plan Expenses from the accounts of Plan participants to third-party service providers, the Plan Fiduciaries also caused the Plan to engage in transactions that constitute a direct or indirect use of Forfeited Plan Assets for the benefit of a party in interest (*i.e.*, Huntington).

85.    Likewise, after the Plan Fiduciaries improperly exercised discretion and control over Plan asset by causing the payment of Plan Expenses from the accounts of Plan participants,

the Plan Fiduciaries then caused the Plan to engage in several transactions with a Party in interest (*i.e.*, Huntington), that for the benefit of Huntington, allowed Huntington to use Forfeited Plan Assets to offset and reduce the amount of RAC (Plan assets) transferred to the Plan.

86.    There are no facts or circumstances throughout the class period that make discretionary decisions to exclusively prioritize the use of Forfeited Plan Assets to reduce Huntington's declared contribution obligation consistent with discharging the Plan Fiduciaries' duties with respect to the Plan *solely* in the interest of the participants and beneficiaries **and for the exclusive purpose of providing benefits to participants** and their beneficiaries ***and defraying reasonable expenses*** of administering the Plan.

87.    These actions are more consistent with the Plan Fiduciaries trying to increase Huntington's profit, despite their fiduciary duties.

88.    While Defendants benefited, the Plan and its participants and beneficiaries suffered. If Defendants decided throughout the class period to use Forfeited Plan Assets to defray the reasonable expenses of administering the Plan, the value of the Plan and the value of the participants' individual accounts would have been greater. Not because the Plan Participants would receive an additional benefit but because they would receive the full benefit they were entitled to under the Plan and ERISA for a defined contribution plan participant.

89.    To be clear, Plaintiff does not allege that ERISA prohibits fiduciaries from *ever* using forfeitures to offset employer contributions. Rather, Plaintiff alleges that under the specific facts and context of this Plan, a loyal and prudent fiduciary would not make the decisions that the Plan Fiduciaries made (as alleged above). Here, under the circumstances described, Defendants have breached their fiduciary duties, ERISA's prohibited transaction rules, and the Plan's own terms.

21

90.    A prudent and loyal fiduciary acting exclusively in the best interest of the participants would only choose to offset plan expenses to the extent that there is concern that Huntington would otherwise be unable to meet its future contribution obligations. Otherwise, reducing Plan expenses is more beneficial to Plan participants.

91.    Similarly, a loyal and prudent fiduciary would only offset the amount necessary to prevent Huntington from being unable to meet its future contributions and then allocate the remaining funds to other more beneficial options, like reducing plan expenses shouldered by the Plan participants.

92.    Upon information and belief, Huntington was able to meet its future contributions throughout the class period and would have been able to meet its RAC each year, even if no forfeitures were applied to offset its contributions.

93.    These facts and actions show, or, at a minimum, necessarily require the inference, that the Defendants either had no prudent processes in place to discharge of the funds timely or acted disloyally preferring to keep all the forfeiture funds to offset the Company's next year contributions beyond what was necessary rather than benefiting the Plan participants.

## TRANSACTIONS PROHIBITED BY ERISA

94.    ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan." *Cunningham*, 145 S. Ct. at 1025.

95.    ERISA Section 1106 (a) prohibits transactions that benefit a party in interest. 29 U.S. Code § 1106(a)(1)(A)-(E).

22

96.     ERISA Section 1106(b) prohibits a fiduciary of the plan from dealing with the assets of the plan in any way that benefits the fiduciary or is adverse to the plan participants' interest.  29 U.S. Code § 1106(b)(1)-(3).

97.     In other words, at least once each year, the Plan Fiduciaries engaged in calculations for the express purpose of calculating how to provide a benefit to Company by causing a transaction, which exchanged Forfeited Plan Assets for money owed by Company to the Plan.[11]

98.     ERISA Section 3(14) defines a party in interest to include the Plan employer (in this case Huntington), a Plan fiduciary (in this case Huntington), and the Plan's third-party administrators.

99.      Under ERISA, anyone who exercises discretion or control over plan assets, including the Plan sponsor (Huntington) and the Plan administrator (Huntington), is a fiduciary. 29 U.S.C. § 1002(21)(A).

100.    The Supreme Court instructs that "[a]t the pleading stage, [] it suffices for a plaintiff plausible to allege the three elements" of a prohibited transaction claim "no more, no less." *Cunningham*, 145 S. Ct. 1020, 1028.

**DEFENDANTS ENGAGED IN SELF-DEALING AND CAUSED MANY PROHIBITED TRANSACTIONS IN VIOLATION OF ERISA**

101.    From 2019 through 2023, the Plan Fiduciaries caused, directed, and authorized tens of thousands of transactions, both directly and indirectly, extracting money from the accounts of

---

[11] It is worth noting that "transactions" under 29 U.S.C. § 1106 are not limited to the use, transfer, or exchange of money that has not yet entered the plan trust. *See* Field Assistance Bulletin 2008-01 (stating an "employer continuing to hold participant contributions commingled with its general assets after the participant contributions reasonably could have been segregated will have engaged in a prohibited transaction in violation of ERISA section 406." https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2008-01).

Plan participants or reducing the net value of investment options held by Participants in the Plan, causing Plan Participants to pay over $28.2 million directly for Plan Expenses as well as additional amounts paid indirectly to the Plan's third-party service providers that should have been covered fully or in part by Forfeited Plan Assets.

102. Some of these transactions are memorialized in the statements received by each Plan Participant and others are also memorialized in Plan level accounting, *e.g.*, a trust report of the Plan and/or the Master Trust holding the assets of the Plan

103. Moreover, throughout at least a portion of the class period, Defendants directed and authorized Plan Participants to pay an indeterminable amount of indirect compensation for Plan Expenses.

104. Had the Defendants acted in accordance with the terms of the Plan document and ERISA the Defendants should have directed the use of Forfeited Plan Assets to defray the Plan Expenses that Defendants instead required Plan Participants to pay through transactions from their individual accounts as well as reductions in the value of the accounts of Plan participants.

105. Throughout the class period, Defendants also caused the Plan to engage in several transactions with Huntington, a party in interest, related to Huntington's contractual obligation to make RAC to the Plan. For each of these transactions, the Plan Fiduciaries coordinated with the third-party recordkeeper and Huntington to calculate how much Huntington could reduce its obligatory payment to the Plan by offsetting the full amount owed with the use of Forfeited Plan Assets.

106. In each of these instances, Defendants caused the Plan to engage in a transaction with Huntington that directly resulted in a smaller amount of money being paid by Huntington into the Plan.

107. In other words, each of these transactions was the result of the Plan Fiduciaries engaging in calculations for the express purpose of calculating how much money Huntington could save from its contractual obligation to the Plan by using Forfeited Plan Assets to offset the amount of Huntington's contribution.

108. As noted above, each of these transactions are also memorialized in the Plan trust reports. Each of these transactions then serves to provide the assets necessary to execute thousands of transactions to invest Huntington RAC and Forfeited Plan Assets pursuant to the investment instructions of Plan Participants.

109. In other words, each of these transactions involves the receipt of Huntington declared RAC and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and Huntington RAC to be combined for use in following the investment instructions of thousands of Plan Participants.

110. In other words, throughout the class period, the Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive at least $15.3 million less in Huntington RAC than what Huntington was obligated to make and which increased Company profits by at least $15.3 million.

111. Additionally, the Defendants caused the Plan to engage in these transactions with Huntington that constituted and resulted in the use of Forfeited Plan Assets for the direct and indirect benefit of Huntington, a party in interest and Plan Fiduciary.

112. Throughout the Class Period, by directing, authorizing, and causing at least six transactions with Huntington and tens of thousands of transactions reducing the value of the accounts of Plan Participants, Defendants dealt with the Forfeited Plan Assets in their own

individual interest and in Huntington's interest by using Forfeited Plan Assets to offset Huntington's contractual obligations to the Plan.

113.    Throughout the Class Period, by directing, authorizing, and causing at least six transactions with Huntington and tens of thousands of transactions reducing the value of the accounts of Plan Participants, the individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, Huntington, whose interests are adverse to the Plan or Plan Participants.

114.    Throughout the Class Period, by directing, authorizing, and causing at least six transactions with Huntington and tens of thousands of transactions reducing the value of the accounts of Plan Participants, the individual Plan Fiduciaries received consideration for their own personal accounts from Huntington as a result of their control over the transactions described above with a party in interest, *i.e.*, Huntington, involving the Forfeited Plan Assets, that enabled Huntington to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.

115.    Throughout the class period there were no facts or circumstances that would support the Plan Fiduciaries making an informed and loyal decision related to the use of the Forfeited Plan Assets to fail to use Forfeited Plan Assets to defray Plan Expenses prior to reducing RAC.

116.    Under the circumstances prevailing throughout the class period, an independent and conflict free Plan fiduciary acting ***solely*** in the interest of Plan Participants ***for the exclusive purpose of providing benefits*** to Plan participants ***and defraying reasonable expenses*** of administering the Plan would ***never*** choose to reduce the RAC prior to defraying reasonable expenses of administering the Plan. See 29 U.S. Code Section 1104(a)(1).

26

117.    Throughout the class period there was never a prudent reason for the Plan Fiduciaries to choose to reduce Company's RAC *prior* to defraying reasonable expenses of the plan *unless the Plan Fiduciaries were only considering the exclusive benefit of Company*, which could potentially indirectly benefit each individual Plan Fiduciary.

## CLASS ACTION ALLEGATIONS

118.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

119.    In acting in their representative capacity for the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Huntington Ingalls Industries Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 19, 2019, and running through the date of judgment.

120.    The class includes at least 45,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

121.    There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan with respect to their management and allocation of Forfeited Plan Assets;

c.    Whether Defendants breached the terms of the Plan;

     d.      Whether Plan Fiduciaries engaged in prohibited transactions with Forfeited Plan Assets;

     e.      What are the losses to the Plan resulting from each alleged breach of ERISA; and

     f.      What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.

     g.      Did fiduciaries of the Plan violate the anti-inurement provision of ERISA by using Plan assets for their own benefit?

122.    Plaintiff's claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

123.    Plaintiff will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the class period, has no interest that conflicts with the class, is committed to the vigorous representation of the class, and has engaged experienced and competent lawyers to represent the class.

124.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a); and adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

125.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, such

28

that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

126.    Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

**COUNT I**
**Breach of the Duty to Follow Terms of the Plan Document**
**(29 U.S.C. 1104(a)(1)(D))**

127.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

128.    As alleged herein, 29 U.S.C. 1104(a)(1)(D) imposes a fiduciary duty to act in accordance with the Plan documents and instruments governing the Plan.

129.    The Plan required the Defendants to use the Forfeited Plan Assets to pay all Plan Expenses (both direct and indirect) prior to using Forfeited Plan Assets to reduce Huntington's RAC. Defendants failed to discharge their duty to act in accordance with the Plan document by using Forfeited Plan Assets to reduce employer declared contribution obligations in violation of the explicit terms of the Plan.

130.    As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty to follow the terms of the Plan document.

131.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

132.   Plaintiff and the class have suffered losses as a direct result of the Defendants' breach of their fiduciary duty to follow the terms of the Plan document.

### COUNT II
**Breach of ERISA's Fiduciary Duty of Loyalty**
**(29 U.S.C. 1104(a)(1)(A))**

133.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

134.   When exercising discretion and control over Forfeited Plan Assets and using them to reduce Huntington's declared contributions, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan Participants, the Plan Fiduciaries considered the best interest of Huntington and ignored the Plan document as opposed to the best interest of participants, in violation of ERISA.

135.   When improperly exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan or allocating them back to the accounts of eligible Plan Participants, the Plan Fiduciaries considered the best interests of Huntington, as opposed to Plan Participants, in violation of ERISA.

136.   When exercising control over Forfeited Plan Assets, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan Participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan Participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan in violation of ERISA.

137.    The Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce Company's RAC prior to and instead of defraying reasonable Plan Expenses as required by ERISA was motivated solely for the exclusive benefit of Company.

138.    As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

139.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

140.    Plaintiff and the class have suffered losses as a direct result of the Defendants' breach of their duty of loyalty.

**COUNT III**
**Breach of ERISA's Fiduciary Duty of Prudence**
**(29 U.S.C. 1104(a)(1)(B))**

140.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

141.    When exercising discretion and control over Forfeited Plan Assets and using them to reduce Huntington declared contributions, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

31

character and with like aims, when those aims are to act *solely* in the interest of the Plan Participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan Participants** and their beneficiaries ***and*** **defraying reasonable expenses** of administering the Plan, in violation of ERISA.

142.    When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process. Despite the conflict of interest presented by alternatives under both ERISA and the Plan document, Defendants failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce the Huntington's own declared contribution expenses, as opposed paying Plan Expenses or for other purposes allowable under ERISA, was in the best interest of the Plan's participants or was prudent, and failed to *solely* consider which alternative would promote the **exclusive purpose of providing benefits to Plan Participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan, in violation of ERISA.

143.    By refusing to use Forfeited Plan Assets to eliminate Plan Expenses that were instead charged to participant accounts, and instead deciding to use these Plan assets to reduce the Huntington's own declared contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing Plan Participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

144.    Additionally, by allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to offset Plan Expenses, Defendants' imprudently caused the value of the Plan's assets to decrease by causing Plan Participants to incur expense deductions from their individual accounts that would

32

otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

145.   In other words, the Plan Fiduciaries imprudently caused Forfeited Plan Assets to sit in an unallocated plan-level account for a long period of time instead of using the Forfeited Plan Assets to immediately defray plan expenses *and* provide benefits, then that would be additional imprudent and disloyal conduct.

146.   Had the Plan Fiduciaries conformed with the minimum standard of care required under ERISA, the Plan Fiduciaries would not have used Forfeited Plan Assets to reduce Huntington's declared contribution obligation without first using some or all for Plan Expenses.

147.   Alternatively, had the Plan fiduciaries conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan.

148.   Plaintiff and the class have suffered losses as a direct result of the Defendants' breach of their duty of prudence.

## COUNT IV
**Fiduciary Prohibited Transactions/ Self-Dealing**
**(29 U.S.C. 1106(b))**

148.  Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

149.  29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or

33

beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

150. Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Huntington's contractual obligation to make RAC to the Plan. By allocating these Plan assets toward offsetting Huntington's RAC obligations, Defendants saved Huntington millions of dollars in RAC expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Huntington's own account, in violation of 29 U.S.C. § 1106(b)(1).

151. Additionally or alternatively, Defendants in their individual capacity or as an agent of Defendant Huntington acted in a transaction involving the Plan on behalf of a party (Defendant Huntington) whose interests are adverse to the interests of the Plan and the interests of Plan Participants and their beneficiaries in violation of  29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3).

152. As a result of this prohibited conduct, Defendants caused the Plan and Plan Participants and class to suffer losses in the amount of the Plan assets that were substituted for RAC and lost earnings on those assets.

153. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## COUNT V
### Fiduciary Prohibited Transactions/ Self-Dealing
### (29 U.S.C. 1106(a))

154.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

155.   29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect. . . exchange. . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

156.   Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan Fiduciaries and because Huntington is the employer of Plan Participants.

157.   The Plan's third-party administrators and other service providers are also parties in interest. *See Cunningham*, 145 S. Ct. at 1025 ("[ERISA], in turn defines a "party in interest'" to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities providing services to [the] plan.") (internal citations omitted).

158.   When Defendants elected to use Forfeited Plan Assets as a substitute for future employer contributions to the Plan, thereby saving Huntington millions of dollars in declared contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

159.   When Defendants elected to cause thousands of transactions that reduced the value of the accounts of Plan participants to pay service providers and parties in interest to the plan for the exclusive purpose of allowing Company to reduce its obligation to make RAC, Defendants

35

caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

160.    When Defendants elected to cause thousands of transactions that reduced the value of the accounts of Plan participants to pay service providers and parties in interest to the plan for the exclusive purpose of allowing Company to reduce its obligation to make RAC, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the exclusive benefit of Company and/or individual Plan Fiduciaries in their individual capacity.

161.    As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were not used to defray Plan Expenses and lost investment returns on those assets.

162.    Additionally, when Defendants elected to use Forfeited Plan Assets as a substitute for declared RAC to the Plan and not for Plan Expenses, Defendants caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Plan Expenses from Plaintiff and all Plan Participants' individual accounts that were sent to the Plan's third-party administrators and other third party service providers and that should have been paid in part or full by the Forfeited Plan Assets.

### COUNT VI
### Breach Of ERISA's Anti-Inurement Provision
### (29 U.S.C. 1103(c)(1))

163.    Plaintiff realleges and incorporates herein by reference each preceding  paragraph of this Complaint as though fully set forth herein.

164.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

165.    The balance in a participant's accounts that a participant forfeits when incurring a break in service prior to full vesting of the Company's contributions to the participant's account is an asset of the Plan.

166.    By electing to utilize the majority of these Plan assets as a substitute for the Company's own future contributions to the Plan, thereby saving the Company millions of dollars in contribution expenses, Defendants caused the assets of the plan to inure to the benefit of the employer and failed to defray reasonable expenses of the plan in violation of 29 U.S.C. 1103(c)(1).

167.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through their use of Plan assets. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

168.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT VII
### Failure To Adequately Monitor Other Fiduciaries

169. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

170. Plaintiff restates the above allegations as if fully set forth herein.

171. Defendant Huntington had the authority to appoint and remove members or individuals responsible for Plan forfeitures on HII and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

172. In light of this authority, Defendant Huntington had a duty to monitor those individuals responsible for Plan forfeitures on HII to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

173. Defendant Huntington had a duty to ensure that the individuals responsible for Plan forfeitures possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's forfeitures; and reported regularly to Huntington.

174. The objectively disloyal, imprudent, and conflicted manner in which the HII handled Plan forfeitures inferentially establish that Defendant Huntington breached its duty to monitor by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan forfeitures on HII or have a system in place for doing so, standing idly by as the Plan misallocated Plan forfeiture for Huntington's benefit;

b.   Failing to remove individuals responsible for Plan forfeitures on HII whose performance was inadequate in that these individuals continued to misallocate Plan forfeitures for the benefit of Huntington.

175.   As the consequences of the breaches of the duty to monitor for Plan forfeitures, the Plaintiff and participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

176.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant Huntington is liable to restore to the Plan all losses caused by its failure to adequately monitor individuals responsible for Plan forfeitures on HII. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

- Find and declare that Defendants breached their fiduciary duties, ERISA's anti-inurement provisions, and engaged in prohibited conduct and transactions as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

- Order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

- Determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;

- Order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

- Certify the class, appoint Plaintiff as class representative, and appoint the Chirinos Law Firm PLLC, Butler Curwood, PLC, and Bloom Legal LLC, and HORAN & HORAN, PLLC as class counsel;

- Award to Plaintiff and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

September 19, 2025                          Respectfully submitted,

*/s/ Paul M. Falabella*
Zev Antell (VSB No. 74634)
Paul M. Falabella (VSB No. 81199)
Butler Curwood, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
Email: zev@butlercurwood.com
Email: paul@butlercurwood.com

**CHIRINOS LAW FIRM PLLC**
Tulio D. Chirinos*
370 Camino Gardens Blvd., Ste 106
Boca Raton, FL 33432
Telephone: (561) 299-6334
tchirinos@chirinoslawfirm.com

40

**BLOOM LEGAL LLC**
Seth J. Bloom*
825 Girod Street, Suite A
New Orleans, Louisiana 70113
Telephone: (504) 599-9997
Email: sjb@bloomlegal.com

**HORAN & HORAN, PLLC**
M. Kevin Horan*
Bradley D. Daigneault*
1500 Gateway
P.O. Box 2166
Grenada, MS 38902
Telephone: (662) 226-2185
Email: horanmain@horanandhoranlaw.com


*\* Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and Proposed Class*

41