UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| ETHAN D. DEAN, *individually and as a representative of a class of participants and beneficiaries of the Huntington Ingalls Industries Savings Plan*,<br><br>Plaintiff,<br><br>v.<br><br>HUNTINGTON INGALLS INDUSTRIES, INC. and HII ADMINISTRATIVE COMMITTEE,<br><br>Defendants. | Civil No. 4:25cv124 |

**ORDER**

Pending before the Court is a Motion to Dismiss Plaintiff's First Amended Class Action Complaint (the "Motion") (ECF No. 28) and an accompanying Memorandum in Support thereof (ECF No. 29), filed by Defendants Huntington Ingalls Industries, Inc. ("Huntington") and HII Administrative Committee ("HII") (together, "Defendants").[1] For the following reasons, the Motion (ECF No. 28) is **GRANTED in part** and **DENIED in part**.[2]

[1] The Court has determined that a hearing on the Motion is unnecessary, as the issues for decision are adequately presented in the briefs. *See* E.D. Va. Local Civ. R. 7(J). Defendants' Request for a Hearing on the Motion (ECF No. 34) is therefore **DENIED**.

[2] On November 14, 2025, Defendants filed a Motion to Dismiss Plaintiff's original Class Action Complaint. Mot., ECF No. 22. On December 5, 2025, Plaintiff filed his First Amended Class Action Complaint (ECF No. 25) which superseded the original

# I. BACKGROUND

## A. Facts

In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The Court, however, is "not so bound with respect to a complaint's legal conclusions." *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991) (quoting *District 28, United Mine Workers, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085–86 (4th Cir. 1979)) (citation modified). The Court now turns to the relevant facts as alleged by Plaintiff Ethan D. Dean ("Plaintiff" or "Mr. Dean") in his First Amended Class Action Complaint (the "Amended Complaint"). *See generally* Am. Compl. ¶¶ 1–282, ECF No. 25.

### *1. The Parties*

Huntington is the largest military shipbuilding company in the United States and is headquartered in Newport News, Virginia. Am. Compl. ¶ 21, ECF No. 25. HII is the administrator of the Huntington Ingalls Industries Savings Plan (the "Plan"), and Huntington is the sponsor of the Plan. *Id.* ¶¶ 1, 23–24. The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §§ 1002(2)(A) and 1002(34) that covers eligible employees of Huntington and is subject to the provisions of the Employee Retirement Income Security Act of 1974

---

complaint as the operative pleading in this case. Therefore, the Motion to Dismiss Plaintiff's original Class Action Complaint (ECF No. 22) **is DISMISSED as moot**.

("ERISA"). *Id.* ¶ 14. Defined contribution plans, like the Plan, have become the primary form of retirement savings in the United States, and can be considered our country's *de facto* retirement system. *Id.* ¶ 2.

Mr. Dean is a citizen of the State of Mississippi, was previously employed by Huntington, and was a participant in the Plan. *Id.* ¶ 15. Mr. Dean seeks to certify, and to be appointed class representative of, a class of at least 47,000 members, which includes "[a]ll participants and beneficiaries of [the Plan] (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 19, 2019 and running through the date of judgment" (the "Class Period"). *Id.* ¶¶ 275–76.

*2. The Plan Generally*

In general, all Huntington employees are eligible to participate in the Plan. *Id.* ¶ 57. Throughout the Class Period, the Plan ranged from having between 27,000 participants in 2019, to 46,000 participants in 2024. *Id.* ¶ 52. The Plan had assets ranging from $3.6 billion in 2019 to $5.9 billion in 2024. *Id.* Throughout the Class Period, the Plan has been larger than roughly 99.6% of all defined contribution plans in the United States. *Id.* In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund (the 'Trust Fund"). *Id.* ¶ 53. The Plan's operating documents provide that "[a]ll contributions made by [Huntington] to the Trust Fund will be used for the exclusive benefit of the [p]articipants and their [b]eneficiaries and will not be used for nor diverted to any other purpose except the payment of the costs of maintaining and administering the Plan." *Id.* ¶ 54.

A participant's retirement benefit in the Plan consists of (1) the amount of the participant's voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses paid to third-party-service providers. *Id.* ¶ 55. As the sponsor of the Plan, Huntington drafted and amended the Plan and intended it to comply with the requirements of ERISA and the Internal Revenue Code of 1986, as amended. *Id.* ¶ 56. Huntington is contractually required to make employer retirement account contributions ("RAC") to the Plan on each payroll date. *Id.* ¶¶ 59–60. Huntington paid RAC every year during the Class Period according to the fixed formula set forth in the Plan. *Id.* ¶ 64. Throughout the Class Period, the Plan paid direct and/or indirect compensation to third-party service providers to provide services to the plan ("Plan Expenses"). *Id.* ¶ 70.

*3. Vesting and Forfeiture*

Under the terms of the Plan, participants are immediately vested in their own contributions as well as any actual earnings thereon. *Id.* ¶ 65. In contrast, participants are not 100% vested in RAC *made by Huntington* and any actual earnings thereon until three years of vesting service. *Id.* To the extent that a participant's RAC is not 100% vested upon termination of the participant's employment, the participant forfeits the value of Huntington's RAC and any actual earnings thereon ("Forfeited Plan Assets"). *Id.* ¶ 66. The Plan document instructs HII how to allocate Forfeited Plan Assets, stating, "to the extent not used in the Plan Year to restore [p]articipant's [a]ccounts pursuant to Section 7.05 or to pay expenses in accordance with Section

16.11, [HII] shall apply [Forfeited Plan Assets] to reduce [Huntington's RAC] due for the Plan Year in which they arise." *Id.* ¶ 67.

*4. Forfeited Plan Assets*

The Plan's Form 5500s, which are filed with the Department of Labor for each Plan year and publicly available, detail: (1) the amount Huntington was contractually obligated to make in RAC; (2) the amount of Forfeited Plan Assets used to offset Huntington's RAC; and (3) the amount of Forfeited Plan Assets used to defray Plan Expenses. *Id.* ¶ 173.

From 2019 through 2024, the terms of the Plan contractually obligated Huntington to make RAC to the Plan in the following amounts: (1) in 2019, at least $80,556,499.00; (2) in 2020, at least $90,042,387.00; (3) in 2021, at least $97,254,712.00; (4) in 2022, at least $146,345,662.00; (5) in 2023, at least $149,889,069.00; and (6) in 2024, at least $160,384,128.00. *Id.* ¶ 174.

From 2019 through 2024, HII were required under the terms of the Plan and ERISA to direct the use of Forfeited Plan Assets in the following minimum amounts: (1) in 2019, approximately $3,525,000.00; (2) in 2020, approximately $2,922,000.00; (3) in 2021, approximately $3,633,000.00; (4) in 2022, $4,854,000.00; (5) in 2023, $4,328,000.00; and (6) in 2024, $4,183,000.00. *Id.* ¶ 175.

From 2019 through 2024, HII decided to offset Huntington's obligation to make RAC by allocating Forfeited Plan Assets in the following amounts: (1) in 2019, $2,700,000.00; (2) in 2020, $2,117,000.00; (3) in 2021, $2,304,000.00; (4) in 2022, $3,991,000.00; (5) in 2023, $4,199,000.00; and (6) in 2024, $4,110,000.00. *Id.* ¶ 176.

These actions saved Huntington the respective amounts, which flowed directly to its bottom-line profit. *Id.*

From 2019 through 2024, HII caused Plan participants to pay Plan Expenses through deductions from their accounts and indirectly through revenue sharing or similar methods as described above. *Id.* ¶ 177. The minimum amounts paid by Plan participants either directly or indirectly are estimated to be as follows: (1) in 2019, $4,598,243.00; (2) in 2020, $3,985,761.00; (3) in 2021, $5,953,378.00; (4) in 2022, $5,451,260.00; (5) in 2023, $5,577,573.00; and (6) in 2024, $6,871,810.00. *Id.*

From 2019 through 2024, HII did not use any Forfeited Plan Asserts to offset Plan Expenses, although there was over $19.4 million in Forfeited Plan Assets available for direction. *Id.* ¶ 179. In other words, throughout the Class Period, HII used 0% of the available Forfeited Plan Assets to defray Plan Expenses. *Id.* ¶ 180. Even if the terms of the Plan did not require HII to first use Forfeited Plan Assets to defray Plan Expenses, defraying Plan Expenses was an allowable use of Forfeited Plan Assets. *Id.* ¶ 197. On April 1, 2025, Huntington amended the Plan to provide that Forfeited Plan Assets must first be used to offset Huntington's RAC. *Id.* ¶ 191.

Companies like Huntington use the amounts they have contributed as company contributions in prior years as part of their efforts to attract and retain talented employees in a competitive environment in which other companies are also competing with Huntington to attract and retain the same potential employees. *Id.* ¶ 216. Instead of using Forfeited Plan Assets to defray Plan Expenses charged to the individual accounts of Plan participants on an ongoing basis, HII chose to use all of the

Forfeited Plan Assets for the purpose of offsetting Huntington's RAC obligations to the Plan, thereby saving Huntington millions of dollars at the expense of the Plan. *Id.* ¶ 223.

HII was required to monitor Forfeited Plan Assets and could have ensured that all Forfeited Plan Assets for the Plan year were exhausted by year end, so that they did not remain in an unallocated Plan account. *Id.* ¶ 226. Even though there were sufficient unallocated Forfeited Plans Assets to defray some or all of the Plan Expenses during the Class Period, HII nevertheless chose to allow the unallocated Forfeited Plan Assets in each year to remain unused. *Id.* ¶ 227. HII did not investigate whether there was any set of circumstances that would support a decision to not use unallocated Forfeited Plan Assets to defray Plan Expenses and allows millions of Plan Assets to go unused. *Id.* ¶ 230. HII did not use any Forfeited Plan Assets to reduce the Plan Expenses, which would have benefited the Plan's participants rather than Huntington. *Id.* ¶ 234. Using Forfeited Plan Assets to reduce current and future employer contributions decreased Huntington's own contribution costs and meant that Huntington did not need to take money out of its own general revenues to pay for its RAC obligations. *Id.* ¶ 235.

*5. Plan Administration*

As discussed *supra*, the Plan paid Plan Expenses in the form of direct and/or indirect compensation to third-party service providers who provided services to the Plan throughout the Class Period. *Id.* ¶ 70. Such service providers include Alight Solutions (recordkeeper), Alight Financial Advisors (participant advice services),

McGuireWoods (legal services), Towers Watson (consulting), Deloitte & Touche (accounting), State Street Global Advisors (custodial services), State Street Bank (trustee), and Grant Thornton (accounting), among others. *Id.* ¶ 73. Plan Expenses are paid indirectly from the accounts of Plan participants, even though direct transactions are not visible on the participants' account statements. *Id.* ¶ 78. The use of Plan assets to pay Plan Expenses reduces the funds available to Plan participants for distribution and/or investing, and thereby reduces the value of individual participant accounts. *Id.* ¶ 79.

The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a plan by the plan's "recordkeeper", which includes, among other services, recordkeeping and information management, administration, account maintenance, loan processing, claims processing, accounting (including auditing), contract administrator, consulting, participant communication, and investment management. *Id.* ¶ 74. There are also fees associated with such recordkeeping and administrative services ("RKA"). *Id.*

An overall suite of RKA services is provided to large plans, which includes, but is not limited to: (a) recordkeeping; (b) transaction processing; (c) administrative services; (d) participant communications; (e) maintenance of an employer stock fund; (f) plan document services; (g) plan consulting services; (h) accounting and audit services; (i) compliance support; (j) compliance testing; and, (k) trustee/custodian services. *Id.* ¶ 105.

These RKA services are provided by all national recordkeepers for one price, regardless of the services chosen or utilized by the plan. *Id.* ¶ 106. The services chosen by a large plan do not materially impact the RKA fees charged by recordkeepers for such basic and fungible services. *Id.* All national recordkeepers have the capability to provide similar RKA services to all large defined contribution plans at a very low per participant RKA fee rate. *Id.* ¶ 113. There are no material differences between the RKA services that are offered and provided by national recordkeepers, like Fidelity, Vanguard, T. Rowe Price, Alight, Empower (GreatWest), Voya, and many others. *Id.* All large national recordkeepers offer the same combinations of services as their competitors. *Id.* ¶ 115. As a result, the market for defined contribution retirement plan services is now highly competitive, particularly for large plans that, like the Plan, have a sizable number of participants and a large amount of assets. *Id.* Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant RKA fee. *Id.* ¶ 114.

Typically, a retirement plan with more participants can achieve a lower per-participant RKA fee rate. *Id.* ¶ 98. During the Class Period, the Plan had more participants than 99.9% of all defined contribution plans, which made the Plan eligible for some of the lowest RKA fees in the market. *Id.* ¶ 99. Fiduciaries typically negotiate with their current provider of RKA services and explore potential alternatives to ensure that they are receiving a reasonable RKA fee rate. *Id.* ¶ 140. Defendants' decision-making related to the administration of the Plan resulted in the imposition of

excessive RKA fees which wasted the assets of the Plan and the assets of participants. *Id.* ¶ 148.

*6. Excessive Recordkeeping Fees*

In the three years in which the Plan disclosed its RKA fees transparently, the Plan RKA fees were more than $59 per participant, whereas the fees of many similarly-situated plans were less than $30 per participant. *Id.* ¶ 153. During the Class Period, the Plan was paying higher RKA fees than some of the most similarly-situated plans. *Id.* ¶ 154. In fact, the Plan's RKA fee rates from 2020–2024 were more than double many of the RKA fee rates of similarly-situated plans. *Id.* ¶ 155. Had the Plan not paid excessive and unreasonable RKA fees, every Plan participant would have benefited from a proportionally lower RKA fee. *Id.* ¶ 169.

From 2019 through 2024, HII caused Plan participants to pay over $6.4 million in excessive RKA fees. *Id.* ¶ 252. The excessive RKA fees were paid to a party in interest, Alight Solutions, LLC, the Plan's recordkeeper. *Id.* ¶ 253. From 2019 through 2024, HII caused Plan participants to pay over $28.2 million directly for Plan Expenses as well as additional amounts paid indirectly to the Plan's third-party service providers that should have been covered fully or in part by Forfeited Plan Assets. *Id.* ¶ 257.

**B. Procedural History**

On December 5, 2025, Mr. Dean filed a nine-count Amended Complaint. *See generally id.* Therein, Mr. Dean alleges that: (1) HII breached ERISA's fiduciary duty of prudence and loyalty pursuant to 29 U.S.C. § 1104(a)(1)(A)–(B) with respect to

excessive recordkeeping fees (Count 1); (2) HII engaged in prohibited transactions with a party in interest pursuant to 29 U.S.C. § 1106(a) with respect to excessive recordkeeping fees (Count 2); (3) HII breached its duty to follow the terms of the Plan document pursuant to 29 U.S.C. § 1104(a)(1)(D) (Count 3); (4) HII breached ERISA's fiduciary duty of loyalty pursuant to 29 U.S.C. § 1104(a)(1)(A) with respect to the disloyal allocation of Forfeited Plan Assets (Count 4); (5) HII breached ERISA's fiduciary duty of prudence pursuant to 29 U.S.C. § 1104(a)(1)(B) with respect to the imprudent allocation of Forfeited Plan Assets (Count 5); (6) HII engaged in prohibited transactions and self-dealing pursuant to 29 U.S.C. § 1106(b) with respect to Forfeited Plan Assets (Count 6); (7) HII engaged in prohibited transactions with a party in interest pursuant to 29 U.S.C. § 1106(a) with respect to Forfeited Plan Assets (Count 7); (8) HII breached ERISA's anti-inurement provisions pursuant to 29 U.S.C. § 1103(c)(1) with respect to Forfeited Plan Assets (Count 8); and (9) Huntington failed to adequately monitor other fiduciaries (Count 9). *Id.* ¶¶ 283–349.

On January 12, 2026, Defendants filed the instant Motion, arguing that Mr. Dean has failed to state a claim upon which relief can be granted for each of the nine counts. *See generally* Mot., ECF No. 28; Mem. Supp., ECF No. 29. On February 16, 2026, Mr. Dean filed his response in opposition to the Motion. Pl. Resp. Opp'n, ECF No. 31. On March 9, 2026, Defendants filed their reply. Reply, ECF No. 32.[3] The Motion is ripe for adjudication.

[3] The Court has reviewed and considered the following Notices and Responses, which were filed after the instant Motion (ECF No. 28) became ripe: (1) Defendant's Notice of Supplemental Authority (ECF No. 35); (2) Plaintiff's Notice of Supplemental

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss for failure to state a claim should be granted if the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). An adequate claim requires more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [plaintiff pleads] factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 663.

A threadbare recitation of the "elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Although the truth of the facts alleged is assumed, and the facts are taken in the light most favorable to the plaintiff, courts are not bound by "legal conclusions drawn from the facts" and "need not accept as true unwarranted

Authorities in Opposition to Defendant's Motion to Dismiss (ECF No. 36); (3) Plaintiff's Notice of Supplemental Authorities in Opposition to Defendant's Motion to Dismiss (ECF No. 37); (4) Defendant's Response to Plaintiff's Notice of Supplemental Authority (ECF No. 38); (5) Plaintiff's Notice of Supplemental Authorities in Opposition to Defendant's Motion to Dismiss (ECF No. 39); (6) Defendant's Response to Plaintiff's Notice of Supplemental Authority (ECF No. 40); (7) Plaintiff's Notice of Supplemental Authorities in Opposition to Defendant's Motion to Dismiss (ECF No. 41); (8) Plaintiff's Notice of Supplemental Authorities in Opposition to Defendant's Motion to Dismiss (ECF No. 42); (9) Plaintiff's Notice of Supplemental Authorities in Opposition to Defendant's Motion to Dismiss (ECF No. 43); and Defendant's Response to Plaintiff's Notice of Supplemental Authority (ECF No. 44).

inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face." *Id.* at 570 (internal citations and footnote omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citation modified). A complaint may survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)) (internal quotation marks omitted).

## III. ANALYSIS

### A. ERISA Overview

"In 1974, after careful study of private retirement pension plans, Congress enacted [ERISA][.]"[4] *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). "ERISA protects employee pensions and other benefits by providing insurance . . . specifying certain plan characteristics in detail (such as when and how pensions

[4] ERISA is codified at 29 U.S.C. § 1001 *et. seq.*, with corresponding interpretative bulletins from the Department of Labor codified at 29 C.F.R. § 2509 *et. seq.*

vest [ ]), and by setting forth general fiduciary duties applicable to the management of both pension and nonpension benefit plans." *Varity Corp v. Howe*, 516 U.S. 489, 496 (1996). "A fiduciary within the meaning of ERISA must be someone acting in the capacity of manager, administrator, or financial advisor to a 'plan[.]'" *Pegram v. Herdrich*, 530 U.S. 211, 222 (2000) (quoting 29 U.S.C. §§ 1002(21)(A)(i)–(iii)).

There are a variety of duties and prohibitions under ERISA, a selection of which are pertinent to the instant case. First, "ERISA imposes three broad duties on ERISA fiduciaries." *Peters v. Aetna Inc.*, 2 F.4th 199, 228 (4th Cir. 2021). Such duties are "(1) the duty of loyalty, which requires that all decisions regarding an ERISA plan be made with an eye single to the interests of the participants and beneficiaries; (2) the prudent person fiduciary obligation, which requires a plan fiduciary to act with the care, skill, prudence, and diligence of a prudent person acting under similar circumstances; and (3) the exclusive benefit rule, which requires a fiduciary to act for the exclusive purpose of providing benefits to plan participants." *Id.* (citation modified).

Second, 29 U.S.C. § 1104(a)(1)(D) requires that a fiduciary discharges his duties "in accordance with the documents and instruments governing the plan[.]" Third, 29 U.S.C. § 1106 "prohibits ERISA plan fiduciaries from causing a plan to enter into certain transactions with parties in interest." *Cunningham v. Cornell University*, 604 U.S. 693, 695 (2025) ("*Cunningham*"). Such prohibitions are generally referred to as "prohibited transactions" or "self-dealing." *See generally id.* Fourth and relatedly, ERISA requires that the assets of a plan not be used to inure—or provide a benefit

to—the employer. *See Naylor v. BAE Sys., Inc.*, No. 1:24cv536, 2024 WL 4112322, at *7 (E.D. Va. Sept. 5, 2024).

Fifth and finally, with respect to failure to monitor claims, "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l.*, 575 U.S. 523, 530 (2015); *see also In re Constellation Energy Grp., Inc.,* 738 F. Supp. 2d 602, 614 (D. Md. 2010) (noting that failure to monitor claims "depend on a finding that the defendants breached the underlying duties of prudence and loyalty").

Mr. Dean alleges that Defendants breached the duties of loyalty and prudence, failed to act in accordance with the Plan document, engaged in prohibited transactions and self-dealing, used the assets of the Plan to Defendants' benefit in violation of the anti-inurement provision, and failed to monitor the ongoing administration of the Plan. *See generally* Am. Compl., ECF No. 25. The Court considers each allegation in turn.

### B. Breach of ERISA's Fiduciary Duty of Prudence and Loyalty Pursuant to 29 U.S.C. § 1104(a)(1)(A)–(B) with respect to Excessive Recordkeeping Fees Against HII (Count 1)

Plaintiff alleges that HII breached ERISA's fiduciary duty of (1) prudence; and (2) loyalty when it allowed the Plan to pay excessive recordkeeping service fees, or RKA. Am. Compl. ¶ 286, ECF No. 25. The Court addresses each duty in turn.

#### *1. Prudence*

"To state a viable claim of breach of the duty of prudence under ERISA, a plaintiff must plead direct facts demonstrating a deficient fiduciary process or

circumstantial facts allowing a plausible inference that the fiduciaries' decision was outside of the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hanigan v. Bechtel Glob. Corp.*, No. 1:24cv875, 2024 WL 4528909, at *2 (E.D. Va. Oct. 18, 2024) (citation modified). "Where a plaintiff alleges excessive fees demonstrate the breach of the duty of prudence, the plaintiff must also plead a meaningful benchmark or some kind of context as a point of comparison to determine whether the fee is excessive relative to the services rendered." *Id.* (citation modified). "The plaintiff must [also] include some facts that demonstrate that the fees charged are unreasonable in light of available alternatives." *Id.* (citation modified).

The Court finds that Plaintiff has alleged a meaningful benchmark and provided context to sufficiently state a claim that the RKA fees were excessive. Plaintiff alleges that RKA services have little variation for large plans, and provides a list of services that are allegedly provided by all plans. Am. Compl ¶ 105, ECF No. 25. Plaintiff then states that, during a three-year period where RKA fees were transparently disclosed, Huntington paid RKA fees of more than $59 per participant, whereas the fees of many similarly-situated plans paid RKA fees of less than $30 per participant. *Id.* ¶ 153. Plaintiff then provides a chart showing RKA fees from 2020 to 2024, comparing the RKA fees of similarly-situated retirement savings plans and Huntington's RKA fees. *Id.* ¶ 155.

Courts have held that such allegations were sufficient to state a claim for excessive recordkeeping fees under ERISA. *See, e.g.*, *Lucero v. Credit Union Ret. Plan Ass'n*, No. 22cv208, 2023 WL 2424787, at *3–5 (W.D. Wis. Mar. 9, 2023) (denying

motion to dismiss where plaintiffs alleged that "there isn't a meaningful difference in the recordkeeping services offered by large plans and that whatever differences there are 'do not affect the amount charged by recordkeepers.'"); *Brown v. MITRE Corp.*, No. 22cv10976, 2023 WL 2383772, at *7 (D. Mass. Mar. 6, 2023) (finding allegations sufficient to infer imprudence where plaintiffs alleged that the committee overpaid for recordkeeping services); *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 3:22cv111, 2023 WL 2301962, at *18 (D. Conn. Mar. 1, 2023) ("At this stage, Plaintiffs' [RKA] fee and service comparisons—when combined with other facts about the market for [RKA] services and the [RKA] fee bid process—are enough to support a reasonable inference that Defendants' choice to retain Fidelity as the [RKA] service provider—or their failure to use their leverage to negotiate lower fees with Fidelity—was the result of an imprudent process[.]"); *but see Albert v. Oshkosk Corp.*, 47 F.4th 570, 580 (7th Cir. 2022) (upholding dismissal of complaint for excessive recordkeeping fees but stating "[w]e emphasize that recordkeeping claims in a future case [can] survive the context-sensitive scrutiny of a complaint's allegations courts perform on a motion to dismiss.") (citation modified); *Hanigan,* 2024 WL 4528909, at *3 (dismissing excessive fee claim where the amended complaint failed to plausibly allege a meaningful benchmark and "fail[ed] to allege specific facts that plausibly demonstrate the services provided under the . . . plan are comparable to the services offered by the five comparator . . . plans."); *Naylor*, 2024 WL 4112322, at *7 (finding that plaintiff failed to allege sufficient facts that fees were excessive where plaintiff did not provide any meaningful benchmark for comparison between the plan at issue and the comparator plans

that offer similar services); *Miller v. Packaging Corp. of Am., Inc.*, No. 1:22cv271, 2023 WL 2705818, at *5 (W.D. Mich. Mar. 30, 2023) (dismissing excessive fee claim where plaintiff alleged that recordkeepers "all offer the same bundle of essential services" and finding such allegations conclusory); *Sigetich v. Kroger Co.*, No. 1:21cv697, 2023 WL 2431667, at *8–10 (S.D. Ohio Mar. 9, 2023) (dismissing excessive fee claim because plaintiff's "comparable plans are not comparable plans" where such plans had participants ranging from 47,358 participants to 154,502 participants); *Probst v. Eli Lilly and Co.*, No. 1:22cv1106, 2023 WL 1782611, at *10 (S.D. Ind. Feb. 3, 2023) ("[Plaintiff] allege[d] that all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services. These allegations are wholly conclusory and do nothing to identify what specific types of services comparator plans received relative to the Plan.").

Additionally, where a plaintiff has alleged that recordkeeping services are fungible or competitive—and therefore the fees were excessive relative to the recordkeeping services rendered, or the fiduciary could have negotiated for lower rates—courts have found it proper to deny motions to dismiss claims breach of the fiduciary duty of prudence based on excessive fees. *See Hughes v. Nw. Univ.*, 63 F.4th 615, 632 (7th Cir. 2023) ("*Albert* emphasized the lack of allegations as to the quality or type of recordkeeping services the comparator plans provided . . . [u]nlike in *Albert*, plaintiffs here . . . allege that recordkeeping services are fungible and that the market for them is highly competitive." (internal quotation marks omitted)); *Krutchen v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *3 (3d Cir. July 24, 2024) (collecting cases

where courts accept as true the allegation that recordkeeping services are competitive, and "therefore [that] different recordkeepers must provide similar services"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595–96 (8th Cir. 2009) (reversing district court's dismissal of breach of duty of prudence claim where the complaint alleged that "the 401(k) marketplace is highly competitive . . . [i]t is reasonable . . . to infer from what is alleged that the [decision-making] process was flawed."). Here, Mr. Dean alleges that recordkeeping services are fungible services, and that the market for retirement plan services is highly competitive. Am. Compl. ¶¶ 106, 115, ECF No. 25.

The parties did not identify, and the Court has not located, any Fourth Circuit cases that provide definitive guidance on whether Plaintiff has sufficiently stated a claim with respect to excessive recordkeeping fees. While there are two Eastern District of Virginia cases on point, the court in those cases did not note whether plaintiffs had alleged that the recordkeeping services were competitive and fungible—and each court therefore dismissed the relevant count on the basis that the plaintiff did not sufficiently demonstrate that the services provided by comparator plans were in fact comparable. *See Hanigan*, 2024 WL 4528909, at *3; *Naylor*, 2024 WL 4112322, at *7–8. Given that context, the Court finds that Mr. Dean has sufficiently alleged a meaningful benchmark by alleging that the recordkeeping services market is competitive and fungible, and that HII could have negotiated for lower fees. *See supra* pp. 9–10.

Defendants argue that Count 1 fails because Plaintiff's methodology to calculate the Plan's RKA fees is improper, and because the comparison plans are not

actually comparable benchmarks. Def. Mem. Supp. at 22–25, ECF No. 29.[5] However, the Court agrees that such arguments are "summary judgment-style argument[s]." Pl. Resp. Opp'n at 15, ECF No. 31; *see also Lucero*, 2023 WL 2424787, at *5 ("Defendants have raised fair points about the probative value of the evidence cited in plaintiffs' complaint to show a violation of defendants' duty of prudence . . . But at the pleading stage, plaintiffs' burden is to allege facts that raise their right to relief 'above the speculative level.'" (quoting *Twombly*, 550 U.S. at 545)). Mr. Dean has amply satisfied this standard, and the Motion as to Count 1 with respect to the duty of prudence is therefore denied.

*2. Loyalty*

The Court next considers whether Mr. Dean has sufficiently alleged that HII breached ERISA's fiduciary duty of *loyalty* with respect to excessive recordkeeping fees. 29 U.S.C. § 1104(a)(1)(A) is referred to as the duty of loyalty, which provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" To allege a breach of the duty of loyalty, plaintiffs must allege that a fiduciary "act[ed] for any purpose other than the exclusive benefit of plan participants and beneficiaries." *Nolan, v. Sonic Auto., Inc.*, No. 3:25cv474, 2026 WL 1195596, at *10 (W.D.N.C. May 1, 2026) (internal quotation marks omitted).

[5] This Order utilizes ECF-generated pagination.

"However, a loyalty claim cannot merely piggyback on a prudence claim; it must rest on its own well-pleaded facts." *Id.* (internal quotation marks omitted).

Here, under Count 1, Mr. Dean alleges that Paragraphs 81 to 153 of the Amended Complaint demonstrate that HII "breached [its] fiduciary duties by allowing the Plan to pay excessive recordkeeping services fees[.]" Am. Compl. ¶ 286, ECF No. 25. Having reviewed such paragraphs, Plaintiff has not pled any "independent facts suggesting a disloyal motive or self-interested conduct by Defendants." *Nolan*, 2026 WL 1195596, at *10. Plaintiff is "merely piggyback[ing]" on his prudence claim. *Id.* Therefore, Plaintiff has failed to state a claim that Huntington breached its fiduciary duty of loyalty with respect to excessive recordkeeping fees. The Motion as to Count 1 with respect to the duty of loyalty is granted. Count 1 with respect to the duty of loyalty is hereby dismissed.

### C. Party In Interest Prohibited Transactions Pursuant to 29 U.S.C. § 1106(a) with respect to Recordkeeping Fees Against HII (Count 2)

The Court now considers whether Mr. Dean has sufficiently alleged that HII engaged in prohibited transactions with respect to the recordkeeping fees. ERISA "prohibits ERISA plan fiduciaries from causing a plan to enter into certain transactions with parties in interest." *Cunningham*, 604 U.S. at 695. "Section 1106 supplements the fiduciary's general duty of loyalty to the plan's beneficiaries by categorically barring certain transactions likely to injure the pension plan." *Id.* at 697 (citation modified). A party in interest "include[s] various plan insiders" such as "the plan's administrator, sponsor, and its officers, as well as entities providing services

to the plan." *Id.* (citation modified). "Section 1106(a)(1)(C) contains three elements. It prohibits fiduciaries from (1) causing a plan to engage in a transaction (2) that the fiduciary knows or should know constitutes a direct or indirect furnishing of good, services, or facilities (3) between the plan and a party in interest." *Id.* at 700 (citation modified).

Here, Plaintiffs have alleged that HII paid Alight, a service provider, an excessive recordkeeping fee. Am. Compl. ¶¶ 155, 253, ECF No. 25. However, Defendants argue that Alight does not fit within the definition of "party in interest" because it was not a party in interest at the time that HII entered into a contract with Alight. Def. Mem. Supp. at 28–29, ECF No. 29. The Court agrees.

"Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000). Accordingly, "[i]f a service provider has no prior relationship with a plan before entering a service agreement, the service provider is not a party in interest at the time of the agreement" and "[i]t only becomes a party in interest after the initial transaction occurs, and subsequent transactions are not prohibited absent self-dealing or disloyal conduct." *Peters*, 2 F.4th at 229 (quoting *Sweda v. Univ. of Pa.*, 923 F.3d 320, 337 n.12 (3d Cir. 2019)).

In *Peters*, the Fourth Circuit reversed the district court's finding that Optum was *not* a "party in interest," but in *dicta* affirmed that service providers are not parties in interest at the time an agreement is entered into. *Id.* at 239–240 ("It is true

enough that Optum had no prior relationship with the [p]lan before entering a service agreement with Aetna. But that means only that Optum was not a party in interest at the time it entered the agreement. Optum could become a party in interest after the execution of the Aetna-Optum contracts, when it became a service provider to the plan[.]"). After Optum became a party in interest, Aetna and Optum engaged in a scheme whereby Optum buried certain administrative fees and passed those fees onto participants such as the plaintiff, rather than passing such fees onto Aetna, as was required by the Master Services Agreement under the Plan. *Id.* at 210. The Fourth Circuit therefore found that Plaintiff had produced sufficient evidence that Optum was a party in interest involved in prohibited transactions. *Id.* at 240.

Here, while true that HII continued to pay Alight the allegedly excessive RKA fees over the course of the service agreement, after Alight had indeed *become* a party in interest, this case is distinguishable from *Peters*. The *Peters* court found that the transaction was prohibited because it was based upon a contract violation "rather than a continuance of an initial agreement." *D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 613 (5th Cir. 2023) (rejecting plaintiffs' reliance on *Peters*). This interpretation aligns with the reasoning of a majority of circuits. *See Danza v. Fidelity Mgmt. Tr. Co.*, 533 F. Appx 120, 125 (3d Cir. 2013) ("Fidelity, however, was not a party in interest at the time the Trust Agreement was signed. While Fidelity is currently a party in interest as a service provider to the plan, it was not 'providing services' and was not a fiduciary when the Trust Agreement was signed, so that transaction did not fall within a prohibited category.");

*Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021) (affirming district court's finding that allegedly excessive fee paid by fiduciary to service provider was not a prohibited transaction because "some prior relationship must exist between the fiduciary and the service provider to make the provider a party in interest under § 1106.")[6]; *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018) (dismissing plaintiff's prohibited transaction claims and noting that plaintiff's interpretation of party in interest was "grounded in circular reasoning: the transactions were prohibited because Anthem was a party in interest, and Anthem was a party in interest because it engaged in the prohibited transactions.").[7]

Therefore, as Alight was not a party in interest at the time that it entered into the service agreement with HII, Plaintiff has failed to state a claim upon which relief can be granted pursuant to Count 2. The Motion is therefore granted as to Count 2, and Count 2 is dismissed.

[6] "The class's interpretation leads to an absurd result: the initial agreement with a service provider would simultaneously transform that provider into a party in interest and make that same transaction prohibited under § 1106 . . . Instead, we conclude that some prior relationship must exist between the fiduciary and the service provider to make the provider a party in interest under § 1106." *Ramos*, 1 F.4th at 787 (internal citations omitted).

[7] Plaintiff contends that the Supreme Court's holding in *Cunningham* precludes a finding that Alight was not a party in interest at the time it engaged in the allegedly prohibited transaction. Pl. Resp. Opp'n at 19–20, ECF No. 31. However, *Cunningham* did not address this legal question. *See generally Cunningham*, 604 U.S. 693. *Cunningham* stands for the proposition that ERISA "plaintiffs need only plausibly allege each of [the] elements of a prohibited-transaction claim," and are not required to address affirmative defenses set forth in the exemptions to survive a motion to dismiss. *Id.* at 700–01.

### D. Breach of the Duty to Follow Terms of the Plan Document Pursuant to 29 U.S.C. § 1104(a)(1)(D) against HII (Count 3)

The Court next considers whether Mr. Dean has sufficiently alleged that HII breached its duty to follow the terms of the Plan document. 29 U.S.C. § 1104(a)(1)(D) requires that a fiduciary discharges his duties "in accordance with the documents and instruments governing the plan[.]" Plaintiff alleges that the Plan required HII to use the Forfeited Plan Assets to pay all Plan Expenses prior to using Forfeited Plan Assets to reduce Huntington's RAC. Am. Compl. ¶ 298, ECF No. 25. Therefore, Plaintiff alleges, HII failed to discharge its duty to act in accordance with the Plan document by using Forfeited Plan Assets to reduce employer declared contribution obligations in violation of the explicit terms of the Plan. *Id.* The provision at issue in the Plan document is Section 7.04, Application of Forfeitures, which provides in pertinent part:

> To the extent not used in the Plan Year to restore Participants' Accounts pursuant to Section 7.05 or to pay expenses in accordance with Section 16.11, the Committee shall apply Forfeitures to reduce Company contributions due for the Plan Year in which they arise. Any Forfeitures in excess of the amounts applied to reduce Company contributions and to restore Participants' Accounts in such Plan Year shall be carried forward to restore Participants' Accounts, to reduce Company contributions, and to pay Plan expenses in accordance with Section 16.11 due for succeeding Plan Years.

Decl. Ex. 2 at 45–46, ECF No. 30-2. Mr. Dean contends that such Plan language means that HII was "required to use Forfeited Plan Assets *first* to restore Plan participant accounts or pay Plan Expenses *prior to* applying Forfeited Plan Assets to reduce RAC. Only after the restoration of Plan participant accounts and the payment of Plan Expenses were the HII allowed to reduce Huntington contributions." Am. Compl. ¶¶ 67–68, ECF No. 25.

In *Garner*, our sister court in Alexandria analyzed the same claim brought by a former employee and participant in a retirement plan, premised on identical plan language, and found that the relevant section "does not mandate that forfeitures be used in any particular order, only that they be used for one of three listed purposes—pay administrative expenses, restore participant accounts, or apply to employer contributions." *Garner v. Northrop Grumman Corp.*, No. 1:25cv439, 2025 WL 3488657, at *3 (E.D. Va. Dec. 4, 2025) (the "*Garner* Court"). Therefore, the *Garner* Court concluded, Defendants did not violate the terms of the Plan, as alleged in the Complaint. *Id.* at *4. Defendants further point out that Plaintiff's "forfeiture theory" has been rejected by 25 district courts and the Department of Labor. *See* Def. Mem. Supp. at 2 n.1, ECF No. 29 (collecting cases). In response to such compelling and plentiful authority, Plaintiff "submits that, respectfully, the *Garner* [C]ourt reached the wrong result." Pl. Resp. Opp'n at 22, ECF No. 31. This Court disagrees—the *Garner* Court was well-reasoned and the Court adopts it analysis here:

> The meaning of the phrase "to the extent that" has in its meaning both an element of the word "if" and also of quantity or measurement. In other words, the phrase means that if forfeitures are not used up for the first two listed purposes then any remaining forfeitures can be used for employer contribution. While Section 7.04 certainly implies that forfeitures may be used for the restoration of benefits and Plan expenses, it cannot be reasonably read to mean that forfeitures must be used for the first two purposes before they can be used for employer contributions. For these reasons, using Plan forfeitures as Defendants are alleged to have done in Count 1 did not violate the Plan, or specifically Section 7.04.

*Garner*, 2025 WL 3488657, at *4. Therefore, as in *Garner*, the Court finds that Plaintiffs have failed to state a claim upon which relief can be granted with respect to

Count 3. The Motion is granted as to Count 3. Count 3 of the Amended Complaint is dismissed.

### E. Breach of ERISA's Fiduciary Duty of Loyalty Pursuant to 29 U.S.C. § 1104(a)(1)(A) with respect to the Disloyal Allocation of Forfeited Plan Assets Against HII (Count 4) and Breach of ERISA's Fiduciary Duty of Prudence Pursuant to 29 U.S.C. § 1104(a)(1)(B) with respect to the Imprudent Allocation of Forfeited Plan Assets against HII (Count 5)

In Counts 4 and 5, Mr. Dean alleges that HII breached its duties of loyalty and prudence when it used Forfeited Plan Assets to reduce Huntington's RAC prior to defraying Plan Expenses. Am. Compl. ¶¶ 302–18, ECF No. 25. Additionally, in Count 5, Mr. Dean alleges that HII breached its duty of prudence by allowing Forfeited Plan Assets to sit unused at the end of each year. *Id.* ¶¶ 314–15. The Court will address each allegation in turn.

#### *1. Reduction of Huntington's RAC prior to Defraying Plan Expenses (Counts 4 and 5)*

Specifically, in Count 4, Mr. Dean alleges that HII breached its fiduciary duty of loyalty when it "ignored the Plan document" and reduced Huntington's RAC "instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan Participants[.]" Am Compl. ¶ 303, ECF No. 25. He further alleges in Count 5 that HII breached its fiduciary duty of prudence when it "failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce Huntington's own declared contribution expenses, as opposed [to] paying Plan Expenses . . . was in the best interest of Plan's participants or was prudent[.]" *Id.* ¶ 312.

However, "ERISA does not create an exclusive duty to maximize pecuniary benefits. Rather, the fiduciary duty is fulfilled where the fiduciary ensures that participants have received their promised benefits[.]" *Garner*, 2025 WL 3488657, at *4 (citation modified). Here, as the Court has found that HII did not violate the terms of the Plan, and specifically did not violate Section 7.04, Plaintiffs have not made a plausible claim that Huntington breached its duty of loyalty or prudence when it allocated the Forfeited Plan Assets in the manner so referenced. *Id.* ("Given that Section 7.04 does not require that forfeitures be used as Plaintiffs contend . . . Plaintiffs have failed to allege facts which make plausible their claim that Defendant breached their fiduciary duty of loyalty. For the same reasons, Plaintiffs have failed . . . to state a claim for breach of the fiduciary duty of prudence.") (internal citations omitted). Accordingly, Mr. Dean has not sufficiently alleged that HII breached its duties of loyalty (as alleged in Count 4) and prudence (as alleged in Count 5) when it reduced Huntington's RAC prior to defraying Plan Expenses.

*2. Allowing Forfeited Plan Assets to Sit Unused (Count 5)*

Plaintiff additionally alleges that HII breached its fiduciary duty of prudence in Count 5 by "allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to offset Plan Expenses." Am. Compl. ¶ 314, ECF No. 25. According to Plaintiff, allowing Forfeited Plan Assets "to sit in an unallocated plan-level account for a long period of time instead of using Forfeited Plan Assets to immediately defray [P]lan [E]xpenses" is another example of imprudence. *Id.* ¶ 315. However, once again, such an allocation

process is not only permitted by the Plan, but Section 7.04 of the Plan requires it: "Any Forfeitures in excess of the amounts applied to reduce [Huntington RAC] and to restore [p]articipants' [a]ccounts in such Plan [y]ear *shall be carried forward* to restore [p]articipants' [a]ccounts, to reduce [Huntington's RAC], and to pay Plan [E]xpenses in accordance with Section 16.11 due for succeeding Plan [y]ears." *See* Decl. Ex. 2 at 45–46, ECF No. 30-2 (emphasis added).

Courts have rejected this theory of imprudence absent an allegation that there was an unreasonable delay in allowing Forfeited Plan Assets to sit dormant. *See, e.g, Tillery v. WakeMed Health and Hosps.*, 819 F. Supp. 3d 442, 454–55 (E.D.N.C. 2026) ("At bottom, merely alleging that forfeiture balances existed does not give rise to an inference that defendants breached the duty of prudence."); *Donelson v. Meijer, Inc.*, 828 F. Supp. 3d 898, 905−06 (W.D. Mich. 2025) (noting that plaintiffs provided "no reason to think that the mere existence of a forfeiture balance at year's end necessarily implies an unreasonable delay" and that "it is sometimes practical to not immediately use forfeitures"); *Estay v. Ochsner Clinic Found.*, No. 25cv507, 2026 WL 809570, at *4 (E.D. La. Mar. 24, 2025) (holding that plaintiffs failed to allege a breach of the duty of prudence based upon defendants' delay in utilizing forfeiture amounts). Accordingly, the Court finds that Mr. Dean has not sufficiently alleged in Count 5 that HII breached its duty of prudence when it allowed Forfeited Plan Assets to sit unused.

* * *

As Mr. Dean has not sufficiently alleged that HII breached the duty of prudence or loyalty when it reduced Huntington's RAC prior to defraying Plan Expenses, nor that HII breached its duty of prudence by allowing Forfeited Plan Assets to remain in an account at the end of the Plan year, Mr. Dean has failed to state a claim upon which relief can be granted for Counts 4 and 5. Accordingly, the Motion is granted as to Counts 4 and 5. Counts 4 and 5 of the Amended Complaint are dismissed.

### F. Fiduciary Prohibited Transactions/Self-Dealing Pursuant to 29 U.S.C. § 1106(b) with respect to Forfeited Plan Assets Against HII (Count 6) and Party in Interest Prohibited Transactions Pursuant to 29 U.S.C. § 1106(a) with Respect to Forfeited Plan Assets Against HII (Count 7)

In Count 6, Plaintiff alleges that HII engaged in prohibited transactions and self-dealing in contravention of 29 U.S.C. § 1106(b) with respect to the Forfeited Plan Assets. Am. Compl. ¶¶ 319–324, ECF No. 25. In Count 7, Plaintiff alleges that HII engaged in prohibited transactions in contravention of 29 U.S.C. § 1106(a) with respect to the Forfeited Plan Assets. *Id.* ¶¶ 325–334. The Court addresses Counts 6 and 7 in tandem.

The Court turns to the United States Code. 29 U.S.C. § 1106(b) provides as follows:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

Further, 29 U.S.C. § 1106(a) provides in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan.

"In sum, [29 U.S.C. § 1106(a) and 29 U.S.C. § 1106(b)] prohibit a fiduciary from causing the plan to engage in certain transactions with a party in interest or a Plan fiduciary." *Garner*, 2025 WL 3488657, at *6 (citation modified). "The transactions contemplated by § 1106 are commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length, and which generally involve use of plan assets that are potentially harmful to the plan." *Id.* (citation modified).

Here, Mr. Dean has not demonstrated that the Forfeited Plan Assets form the basis for a prohibited transaction or self-dealing under 29 U.S.C. § 1106(b) (Count 6) or a party in interest prohibited transaction under 29 U.S.C. § 1106(a) (Count 7). As discussed *supra* pp. 24–26, using Forfeited Plan Assets to cover RAC is permitted by Section 7.04 of the Plan, and is in fact "an obligation owed to plan beneficiaries [ ] in order to supply the promised benefits to Plan participants[.]" *Garner*, 2025 WL 3488657, at *5. Mr. Dean has not "alleged that any of the [Forfeited Plan Assets] were removed from the Plan or were used in any type of 'transaction' necessary to impose liability under 29 U.S.C. § 1106." *Id.*, at *6. Therefore, Mr. Dean has failed to state a

claim upon which relief can be granted pursuant to Counts 6 and 7. The Motion is granted as to 6 and 7. Counts 6 and 7 of the Amended Complaint are hereby dismissed.

### G. Breach of ERISA's Anti-Inurement Provision Pursuant to 29 U.S.C. § 1103(c)(1) with respect to Forfeited Plan Assets Against HII (Count 8)

In Count 8, Plaintiff alleges that Huntington breached ERISA's anti-inurement provision pursuant to 29 U.S.C. § 1103(c)(1) with respect to the Forfeited Plan Assets. Am Compl. ¶¶ 335–341, ECF No. 25. Section 1103(c)(1) provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." The Court once again adopts the analysis of the *Garner* Court, which analyzed identical plan language and resulting forfeited plan assets, and found that Plaintiffs had failed to state a claim for breach of ERISA's anti-inurement provision:

> Section 7.04 specifies in no particular order three permissible uses of forfeited funds –restoring employee accounts, paying administrative expenses and making employer contributions. Making employer contributions required under a Plan is an obligation owed to plan beneficiaries necessary in order to supply the promised benefits to Plan participants; and when the employer here . . .used Plan assets to pay its employer contribution obligations to Plan beneficiaries, with funds permitted to be used for that purpose, those funds were therefore used for and never held for any other reason than [ ] provid[ing] benefits to participants in the plan and their beneficiaries. For these reasons, Plaintiffs have failed to state a claim for breach of ERISA's anti-inurement provision.

*Garner*, 2025 WL 3488657, at *5 (citation modified); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442–43 (1999) ("Because only one plan exists and

respondents do not allege that [the employer] used any of the assets for a purpose other than to pay its obligations to the Plan's beneficiaries, [the employer] could not have violated the anti-inurement provision under [29 U.S.C. § 1103(c)(1)]."); *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 22 (2004) ("The [anti-inurement] provision demands only that plan assets be held for supplying benefits to plan participants.") In light of the above, Mr. Dean has not plausibly alleged that the assets of the Plan were inured to the benefit of HII and he has failed to state a claim upon which relief can be granted pursuant to ERISA's anti-inurement provision. The Motion as to Count 8 is therefore granted. Count 8 of the Amended Complaint is hereby dismissed.

### H. Failure to Adequately Monitor Other Fiduciaries Against Huntington (Count 9)

The Court next considers whether Mr. Dean has sufficiently alleged that Huntington failed to adequately monitor other fiduciaries. "A claim for the failure to monitor derives from and depends on an underlying breach of fiduciary duty cognizable under ERISA." *Kendall v. Pharm. Prod. Dev.*, LLC, No. 7:20cv71, 2021 WL 1231415, at *11 (E.D.N.C. Mar. 31, 2021) (internal quotation marks omitted). Thus, the "duty to monitor claim is only as broad as the surviving prudence claim[.]" *Id.* at 12. Plaintiff alleges, *inter alia*, that Huntington "fail[ed] to monitor and evaluate the performance of individuals responsible for RKA fees on the HII or have a system in place for doing so" and "fail[ed] to investigate the availability of more reasonably-priced recordkeepers in a timely manner." Am. Compl. ¶ 347, ECF No. 25.

Here, Defendants argue that "[b]ecause Plaintiff's fiduciary breach claims fail, his monitoring claim also fails and should be dismissed." Def. Mem. Supp. at 31, ECF No. 29. Plaintiff sufficiently stated a claim for the breach of the duty of prudence with respect to excessive recordkeeping fees. *See supra* pp. 15–20. Therefore, his monitoring claim with respect to that alleged breach has also been plausibly alleged. *See Kendall*, 2021 WL 1231415, at *12 ("[I]n light of this court's conclusion that a portion of the prudence claim survives for now, plaintiffs have alleged a plausible claim for breach of the duty to monitor."); *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629 F. Supp. 3d 352, 367 (M.D.N.C. 2022) ("Because this court has found Plaintiffs' excessive fee allegations state a plausible imprudence claim, Plaintiff's monitoring claim survives as well.") (internal citations omitted). Therefore, the Motion is denied as to Count 9 with respect to the allegation that Huntington failed to monitor HII, who allegedly breached the duty of prudence with respect to excessive recordkeeping fees.

## IV. CONCLUSION

For the foregoing reasons, the Motion (ECF No. 28) is **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** as to Count 1 with respect to the breach of the duty of loyalty, and as to Counts 2, 3, 4, 5, 6, 7, and 8. Count 1 (with respect to the breach of the duty of loyalty only), as well as Counts 2, 3, 4, 5, 6, 7, and 8, are hereby **DISMISSED with prejudice**. The Motion is **DENIED** as to Count 1 with respect to the breach of the duty of prudence, and as to Count 9, with respect to the allegation that Huntington failed to monitor HII, who allegedly breached the duty of prudence with respect to excessive recordkeeping fees. The Clerk is **REQUESTED**

to forward a copy of this Order to counsel of record for all parties.

**IT IS SO ORDERED.**

/s/
Arenda L. Wright Allen
Senior United States District Judge

September 21, 2026
Norfolk, Virginia